Kevin J. Blakley #010777
Timothy J. Martens #012260
**GAMMAGE & BURNHAM**
A PROFESSIONAL LIMITED LIABILITY COMPANY
ATTORNEYS AT LAW
TWO NORTH CENTRAL AVENUE
18TH FLOOR
PHOENIX, AZ 85004
TELEPHONE (602) 256-0566
FACSIMILE (602) 256-4465
KBLAKLEY@GBLAW.COM

Attorneys for Movant

# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>SEDONA DEVELOPMENT PARTNERS, LLC,<br><br>Debtor.<br>―――――――――――――――<br>DEVELOPER FINANCE CORPORATION, a Delaware corporation,<br><br>Movant,<br><br>vs.<br><br>SEDONA DEVELOPMENT PARTNERS, LLC,<br><br>Respondent. | NO. 2:10-bk-16711-RTBP<br><br>CHAPTER 11<br><br>**MOTION FOR RELIEF FROM AUTOMATIC STAY** |

Developer Finance Corporation, a Delaware corporation ("movant") for its motion for relief from the automatic stay, states as follows:

1.      The debtor in the above-captioned bankruptcy case purports to hold title to or claims an interest in certain real property and the improvements thereon, and rents, issues, profits and proceeds therefrom, if any, located in Sedona, Yavapai County, Arizona,

1  legally described on Exhibit "A" attached hereto and incorporated herein by this reference

2  (hereinafter the "Property").

3       2.    On May 27, 2010, the debtor filed a petition under Chapter 11 of the

4  Bankruptcy Code thereby staying the commencement or continuation of any court

5  proceedings against the debtor or any act to obtain possession of property of the debtor or

6  to enforce any lien against property of the debtor as provided by 11 U.S.C. § 362. Movant

7  is the holder of a first position lien upon the Property.

8       3.    Movant hereby seeks to annul the automatic stay imposed upon movant

9  pursuant to 11 U.S.C. § 362(d) or, in the alternative, for adequate protection in accordance

10 with 11 U.S.C. § 361.

11      4.    On July 26, 2006, movant and debtor entered into a Credit Agreement, a

12 copy of which is attached as Exhibit "B", wherein movant agreed to extend to debtor a

13 construction loan in the principal amount of up to $3,000,000.00 (the "Loan"). The Loan is

14 further evidenced by a Credit Note dated July 26, 2006 (the "Note") in the amount of

15 $3,000,000.00, a copy of which is attached as Exhibit "C".

16      5.    On July 26, 2006, in order to secure the Debtor's obligations under the

17 credit Agreement and payment of the Note, debtor, as trustor, executed and delivered a

18 Deed of Trust, Assignment of Leases and Rents, Security Agreement and Fixture Filing

19 ("Deed of Trust") to movant, as beneficiary, to secure the obligations under the Note. The

20 Deed of Trust was recorded on August 3, 2006 in the Official Records of the Yavapai

21 County, Arizona Recorder at Book 4422, page 372, a copy which is attached hereto as

22 Exhibit "D". The Note is further secured by a UCC-1 ("UCC") financing statement filed

23 with the Arizona Secretary of State on August 4, 2006, filing number 2006-14375630, a

24 copy of which is attached as Exhibit "E".

25      6.    The installments due on the Note and the Deed of Trust are in default and

26 movant, therefore, elected to declare the whole sum of principal and interest on the Note

1  immediately due and payable. As of May 27, 2010, the principal balance due on the Note

2  is $3,000,000, together with interest thereon at the default rate set forth in the Note plus

3  attorneys' fees, late charges, costs and other expenses incurred in connection with this

4  action and the enforcement of the Loan and Deed of Trust. As of May 27, 2010, the total

5  balance due on the Loan, excluding attorneys' fees and other costs was $3,601,399.97.

6      7.    In addition, pursuant to that Agreement dated January 19, 2007, pursuant to

7  that Credit Agreement dated January 19, 2007, by and between Debtor, Movant and Cavan

8  Management Services, LLC (the "Second Loan"), evidenced by a Promissory Note of even

9  date therewith in the principal sum of $1,000,000 (the "Second Note"). The Second Note is

10 secured by, among other things, that Second Deed of Trust and Assignment of Rents dated

11 January 19, 2007 executed by Debtor as Trustor and recorded in the Official Records of the

12 Yavapai County Recorder on January 26, 2007 at Book 4475, Page 722, Official Records

13 (the "Second Deed of Trust"), a true and correct copy of which is attached as Exhibit "F"

14 hereto. As the date of this motion, the principal basis on the Second Loan is $1,000,000.

15 As of May 27, 2010, the total balance due on the Second Loan is $1,452,985.50 plus

16 accrued and accruing interest, attorneys fees, costs and other amounts as set forth in the

17 Credit Agreement, and Second Deed of Trust.

18      8.    Movant is entitled to relief from the automatic stay of 11 U.S.C. § 362 for

19 the following reasons:

20      (a)    Cause exists for relief from the stay pursuant to § 362(d)(1) due to

21 the lack of adequate protection of movant's interest in the Property;

22      (b)    Pursuant to § 362(d)(2), the debtor has no equity in the Property and

23 the Property is not necessary for an effective reorganization; alternatively, the debtor has no

24 equity in the Property and there is no possibility of a successful reorganization within a

25 reasonable time.

26

1    9.    Movant has suffered, and continues to suffer, immediate and irreparable

2    injury by virtue of being restrained from its contractual rights with respect to the Property.

3    10.    Under the circumstances, movant is entitled to relief from the automatic

4    stay of actions against the debtor to permit it to enforce the deed of trust against the

5    Property. Alternatively, the Court should require that adequate protection be provided to

6    movant to protect movant against any decrease in the value of the Property.

7    THEREFORE, movant requests the following relief:

8    1.    That this Court enter an order lifting and annulling the automatic stay

9    provided pursuant to 11 U.S.C. § 362 and any other applicable rules or orders to permit

10    movant to proceed to foreclose the deed of trust upon the Property and authorize movant to

11    take such actions as may be necessary or proper to enforce its liens against the Property and

12    the rents, issues, profits and proceeds therefrom.

13    2.    In the alternative, that this Court require the debtor to provide adequate

14    protection to movant.

15    3.    For such other and further relief as is just and proper.

16    RESPECTFULLY SUBMITTED this _15_ day of June, 2010.

17    GAMMAGE & BURNHAM P.L.C.

18

19    By_____

20    Kevin J. Blakley
     Timothy J. Martens
21    Two N. Central Avenue, 18th Floor
     Phoenix, Arizona 85004
22    Attorneys for Movant Developer Finance
     Corporation
23

24

25

26

Copy of the foregoing sent by
electronic mail where indicated and/or
mailed this _15th_ day of June,
2010, to:

Sedona Development Partners, LLC
755 Golf Club Way
Sedona, Arizona  86336

Philip R. Rudd
prudd@polsinelli.com
Polsinelli Shughart, PC
Security Title Plaza
3636 North Central Avenue
Suite 1200
Phoenix, Arizona  85012

U.S. Trustee
Office of the U.S. Trustee
230 North First Avenue, Ste. 204
Phoenix, AZ  85003

_Jackie Benton_

## Exhibit "A"

## Legal Description

Tract "C" and Tract "D", Sedona at Seven Canyons – Unit II, according to Book 47 of Maps and Plats, Pages 88 and 89 and Affidavit of Correction recorded in Book 4084 of Official Records of Yavapai County, Arizona, Page 509.

**Exhibit "B"**

**Credit Agreement**

## CREDIT AGREEMENT

THIS CREDIT AGREEMENT, dated as of July 26, 2006, is among **SEDONA DEVELOPMENT PARTNERS, LLC**, an Arizona limited liability company having its principal place of business located at 15333 N. Pima Road #305, Scottsdale, Arizona 85260 (the "Borrower"), **CAVAN MANAGEMENT SERVICES, LLC**, an Arizona limited liability company having its principal place of business located at 15333 N. Pima Road #305, Scottsdale, Arizona 85260, (the "Guarantor"), and **DEVELOPER FINANCE CORPORATION**, a Delaware corporation having its principal place of business located at 430 Main Street, Suite 3, Williamstown, Massachusetts 01267 ("DFC"). Capitalized terms used herein but not defined herein shall have the meanings set forth on Exhibit 1, a copy of which is attached hereto and hereby incorporated by reference, and shall include in the singular number the plural and in the plural number the singular.

## W I T N E S S E T H:

WHEREAS, the Borrower has requested that DFC make available to it the credit facility herein provided in connection with the Project/certain real property and Lots owned or to be acquired by Borrower at the Project as provided for herein; and

WHEREAS, DFC is willing to extend such credit facility to the Borrower on the terms and conditions herein provided;

NOW, THEREFORE, IT IS AGREED:

Section 1.    THE LOAN FACILITY.

    1.1    The Loan. Subject to the terms and conditions set forth herein and in the other Loan Documents, DFC agrees to make Advances to the Borrower during the Borrowing Period in an aggregate amount not to exceed the Credit Loan Commitment in connection with Borrower's construction of amenities at the Project. DFC's Loan to the Borrower shall not exceed the lesser of (i) $3,000,000.00 or (ii) 75% of the appraised value of the Property. There shall be no re-borrowing under this Agreement.

    1.2    Notice of Borrowing.

    (a)    The Borrower shall give irrevocable written notice to DFC on or prior to 11:00 A.M. (Eastern time) on the Business Day preceding the date on which the Loan is to be made. Such notice (the "Notice of Borrowing") shall specify (i) the date of the proposed borrowing, which shall be a Business Day during the Borrowing Period (the "Borrowing Date") and (ii) the amount of the proposed borrowing. If DFC receives a Notice of Borrowing after the time specified herein, such Notice of Borrowing shall not be effective.

PHX/1817190.2

(b)     Not later than 4:00 P.M. (Eastern time) on the Closing Date, and upon fulfillment of the conditions set forth herein, DFC will deposit the net proceeds of the Loan to the account the Borrower has designated in writing.

### 1.3     Credit Note.

(a)     The Borrower's obligation to pay the principal of, and interest on the Loan shall be evidenced by the Credit Note, payable to the order of DFC.

(b)     The Credit Note shall: (i) be dated the Closing Date; (ii) be in an original principal amount equal to the Credit Loan Commitment; (iii) be payable in full on the Credit Maturity Date (subject to mandatory prepayment as herein provided); (iv) bear interest as provided in Section 2 hereof; and (v) be entitled to the benefits of this Agreement. The Credit Note shall be, and hereby is, secured by the Collateral and the Security Documents.

(c)     The principal amount of the Loan outstanding from time to time, and interest accrued thereon, shall be recorded on the records of DFC. The Borrower's obligation to pay principal and interest in respect of the Credit Note shall be limited to the unpaid principal amount of the Loan evidenced thereby and unpaid interest accrued for the periods during which the Loan is outstanding.

### 1.4     Maturity of the Loan; Mandatory Prepayments of Loan.

(a)     The Loan and other Obligations owing under this Agreement and the other Loan Documents shall be due and payable on the Credit Maturity Date, subject to earlier payment and acceleration as provided for herein. Borrower agrees and understands that DFC shall have absolutely no obligation or commitment whatsoever to renew, extend or refinance the Loan on the Credit Maturity Date, or otherwise, or to give Borrower any other credit accommodation.

(b) In the event of an extension of the Credit Maturity Date hereunder, the Borrower shall make mandatory quarterly payments of principal in the amount of $750,000.00 each, less any Release Payments received in that quarter, commencing on the first calendar day of the month following the date which is fifteen (15) months after the Closing Date. Subsequent quarterly principal payments shall be due and payable on the first day of every third month. Any excess quarterly principal payments received in any one quarter shall be applied and credited to the next scheduled quarterly principal payment.

(c)     The Borrower shall immediately prepay the Credit Note held by DFC to the extent that the aggregate outstanding principal amount thereof on any day shall exceed the amount of the Credit Loan Commitment in effect on such day; provided that if the Credit Loan Commitment is terminated in full, then the Borrower shall immediately prepay in full the aggregate outstanding principal amount of the Credit Note.

2

(d)     The Borrower shall immediately prepay the Credit Note held by DFC to the extent that the aggregate outstanding principal amount thereof on any day shall exceed the Credit Loan Commitment on such day.

1.5     Voluntary Repayment of the Loan. The Borrower shall have the right, at any time and from time to time, upon at least thirty (30) Business Day's prior written notice to DFC to prepay the Loan in whole, or in part, together with all interest accrued thereon, plus one percent (1%) of the outstanding principal amount prepaid during the first twelve months (the "Prepayment Premium"); provided that at the time of any such prepayment of the Loan, the Borrower shall pay all interest accrued on the amount of such prepayment and all fees and other payment obligations arising from such prepayment, provided that the foregoing shall not terminate the Borrower's obligation to pay Release Payments.

1.6     Collateral. Payment and performance of the Loan and the Obligations are secured by the Security Documents, pursuant to which the Borrower has collaterally assigned and pledged to DFC all of the Borrower's right, title and interest in and to the Collateral, by a first and prior security interest in the Property, Additional Collateral Property, and the other Collateral described in the Mortgage, and by a first priority collateral assignment of the Borrower's interest in any and all construction contracts and documents related to Project construction and development. In addition, payment and performance of the Loan and Obligations are guaranteed pursuant to the Guarantee.

Section 2.     INTEREST.

2.1     Rate of Interest. The Borrower shall pay interest on the unpaid principal amount of the Loan made by DFC from the Closing Date until such principal amount shall be paid in full, at the Interest Rate.

2.2     Monthly Interest Payments. Accrued and unpaid interest on the Loan shall be due and payable in arrears on the first day of each month. Notwithstanding the foregoing or any other provision herein or in any Loan Document, interest payable at the Past-Due Rate (as hereinafter defined) as specified herein shall be payable from time to time on demand of DFC.

2.3     Overdue Payment of Principal and Interest. Overdue principal of, and overdue interest in respect of, the Loan shall bear interest for each day (after as well as before judgment), payable on demand, at a rate per annum (the "Past-Due Rate") equal to 5% in excess of the rate of interest otherwise payable on such date; provided that, if (a) an Event of Default described in Section 8 occurs with respect to the Borrower, or (b) the principal of any of the Credit Note is declared to be immediately due and payable, then the Past-Due Rate for each day thereafter (after as well as before judgment) shall be equal to the greater of (i) the rate computed in

3

accordance with the foregoing provisions of this Section 2.3 or (ii) 18%.

    2.4    Interest Reserve. An interest reserve Advance in an amount equal to $500,000.00 (the "Interest Reserve") shall be fully funded on the Closing Date and may be utilized by the Borrower, provided that no default or Event of Default has occurred, to pay interest payments due hereunder. Any Advance made in connection with the Interest Reserve shall accrue interest at the Interest Rate and shall count toward the calculation of the Credit Loan Commitment. The Borrower will be responsible for making interest payments out-of-pocket in the event the Interest Reserve amount is insufficient to pay scheduled interest payments.

    Section 3.    FEES

    3.1    Advance Fee. The Borrower shall pay the Advance Fee from the proceeds of the Advance.

    3.2    Release Payments. Provided that Borrower subdivides the Property or Additional Collateral Property into Lots, and further provided that Borrower is not in default in the payment or performance of any Obligation owed DFC hereunder, or any other agreement by and between Borrower with or for the benefit of DFC and/or any of its Affiliates or Subsidiaries, DFC shall release each Lot from the lien of the Mortgage encumbering same upon the Borrower's sale of such Lot to a bona fide third party consumer purchaser upon the payment to DFC of a release payment (and accrued interest thereon) in an amount to be determined by DFC in its sole and absolute discretion (the "Release Payment"). The Release Payment shall be due and payable immediately upon the closing of the respective Lot. DFC shall have no obligation to release any Lot which has not been legally subdivided.

    3.3    Late Fee. The Borrower shall pay to DFC a late fee equal to five percent (5%) of any payment due DFC by the Borrower which is not received by DFC within five (5) days of its due date; provided, however, that no late fee shall be payable upon amounts due at Maturity or upon acceleration. The Borrower acknowledges and agrees that such late fee is reasonable in light of the anticipated and actual harm caused by late payments, the difficulties of proof of loss, harm and damages; and the inconvenience and non-feasibility of DFC otherwise obtaining an adequate remedy.

    3.4    Wiring Fee. The Borrower shall pay DFC a $35.00 fee in connection with each wire processed by DFC.

    3.6    Documentation Fee. The Borrower shall pay DFC a documentation fee equal to $2,500.00, due and payable on the Closing Date.

    3.7    Facility Fee. The Borrower shall have paid DFC a facility fee equal to $30,000.00 (the "Facility Fee"). The Facility Fee shall be non-refundable to the Borrower.

4

## Section 4.    PAYMENTS, ETC.

4.1    Payments on Non-Business Days; Calculations.  Borrower shall make each payment hereunder and under the Credit Note not later than 1:00 P.M. (Eastern time) on the day when due in U.S. dollars to DFC at its address set forth above in same day funds.  Whenever any payment to be made hereunder or under the Credit Note shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and interest shall be payable at the applicable rate during such extension.  Interest on the Loan and the other fees hereunder and under the Loan Documents shall be calculated on the basis of a 360-day year and the actual number of days elapsed.  The Borrower hereby authorizes and directs DFC to charge any account of the Borrower maintained at DFC's office with the amount of any principal, interest or fee when the same becomes due and payable under the terms hereof or of the Credit Note; provided, however, that DFC shall not be under any obligation to charge any such account. Each determination by DFC of an Interest Rate hereunder shall be conclusive and binding for all purposes, absent manifest error.

4.2    Net Payments; Application.    Unless otherwise specifically provided herein, all payments under or pursuant to, or in satisfaction of any of the Borrower's obligations under this Agreement or under the Credit Note (including any received in connection with the foreclosure upon or other realization on any Collateral will be applied in the following order of priority: (a) to any amounts not otherwise listed in this Section 4.2 then due and payable under this Agreement, the Credit Note or the Security Documents, (b) to any fees then due and payable, (c) to any interest on the Loan then due and payable, (d) to any principal amount then due under the Loan, whether regularly scheduled, by acceleration or otherwise and (e) to all other Obligations then due and payable.

## Section 5A.    CONDITIONS PRECEDENT TO THE INITIAL LOAN.

DFC shall not be obligated to make the initial Loan hereunder unless on the date of the Loan the following conditions have been fulfilled to the satisfaction of DFC in its sole satisfaction:

5A.1    Default, etc.  On the date of the Loan there shall exist no Default or Event of Default and all representations and warranties made by the Borrower and Guarantor herein or in the other Loan Documents or otherwise made by the Borrower and Guarantor in writing in connection herewith or therewith shall be true and correct in all material respects with the same effect as though such representations and warranties have been made at and as of such time.

5A.2    Credit Note.  DFC shall have received from the Borrower the Credit Note, duly executed and completed by the Borrower.

5

5A.3   Mortgage.  DFC shall have received the Mortgage, properly recorded, to stay in place until such time as the Obligations are paid in full.

5A.4   Title Commitment.  An irrevocable and fully paid commitment for the issuance of an ALTA lender's policy of title insurance in the amount of the Loan insuring the first priority lien of the duly executed and recorded Mortgage encumbering the Lots.

5A.5   Guarantee.    DFC shall have received the duly executed Guarantee of the Guarantor.

5A.6   Loan Documents.  All Loan Documents shall have been duly executed and delivered by each party thereto.

5A.7   Supporting Documents of the Borrower and Guarantor.  There shall have been delivered to DFC such information and copies of documents, approvals (if any) and records (certified where appropriate) of corporate and legal proceedings as DFC may have requested relating to the Borrower's and the Guarantor's entering into and performance of the Loan Documents and the other agreements and documents related thereto to which it is a party.  Such documents shall, in any event, include:

(i)      certified copies of the Charter Documents of the Borrower and the Guarantor;

(ii)     certificates of authorized officers of the Borrower, certifying the corporate resolutions of such entity relating to the entering into and performance of the Loan Documents by the Borrower and the transactions contemplated thereby; and

(iii)    certificates of authorized officers of the Borrower with respect to the incumbency and specimen signatures of the Borrower's officers or representatives authorized to execute such documents and any other documents and papers, and to take any other action, in connection therewith.

5A.8   Security Documents.  There shall have been delivered to DFC:

(i)      If requested by DFC, a security agreement executed by the Borrower and the Guarantor, as the same may from time to time be amended, supplemented or otherwise modified covering all of the Collateral (the "Security Agreement").

(ii)     Copies of such consents of third parties as are required or DFC may reasonably request.

(iii)    Evidence satisfactory to DFC of all filings of financing statements (and assignments thereof) under the Uniform Commercial Code and applicable law, satisfactory Lien search requests confirming the absence of any perfected Liens prior to DFC's Liens (except

6

those consented to in writing by DFC) and evidence of completion of all other actions with respect to the Liens created by the Security Documents as are necessary or appropriate to perfect such Liens. The Borrower hereby authorizes DFC to file one or more financing or continuation statements, and amendments thereto and assignments thereof, relative to all or any of the Collateral and the proceeds of the foregoing now existing or hereafter arising, without the signature of the Borrower where permitted by law. The Borrower hereby ratifies and authorizes the filing by DFC of any such financing statement made prior to the date hereof. A carbon, photographic or other reproduction of this Agreement or any financing statement covering the Receivables, the Collateral, or any part thereof, shall be sufficient as a financing statement.

5A.9    Insurance.  There shall have been delivered to DFC copies of such policies of liability and property insurance covering the Borrower and the Property as DFC may reasonably request.

5A.10    Approvals and Consents.  All orders, permissions, consents, approvals, licenses, authorizations and validations of, and filings, recordings and registrations with, and exemptions by (all of the foregoing, "Requisite Consents"), any Government Authority, or any other Person, required to authorize or required in connection with the execution, delivery and performance by the Borrower of this Agreement, the other Loan Documents, other agreements and the transactions contemplated hereby and thereby shall have been obtained.

5A.11    Legal Opinions. DFC shall have received legal opinions, addressed to DFC and dated the Closing Date, of counsel to the Borrower and the Guarantor, covering such matters as DFC may request.

5A.12    Adverse Change.  There shall have been, in DFC's opinion, no Material Adverse Change with respect to the Borrower since the date of this Agreement.

5A.13    Change in Law; No Opposition.

(i)    On the date of the Loan, no change shall have occurred in applicable law, or in applicable regulations thereunder or in interpretations thereof by any Government Authority which, in the opinion of DFC, would make it illegal for DFC to make the Loan required to be made on such date.

(ii)    No suit, action or proceeding shall be pending or threatened before or by any Government Authority seeking to restrain or prohibit the consummation of the transactions contemplated by this Agreement.

5A.14    All Proceedings to be Satisfactory.  All corporate and legal proceedings and all instruments in connection with the transactions contemplated by this Agreement and the other documents referred to herein shall be satisfactory in form and substance to DFC and DFC shall have received all information and copies of all documents which DFC may reasonably have requested in

7

connection herewith, such documents where appropriate to be certified by proper corporate officials or governmental authorities.

5A.15 <u>Fees and Expenses</u>. All fees due to DFC and the legal fees and expenses of DFC's counsel shall have been paid in full.

5A.16 <u>Notice of Borrowing</u>. DFC shall have received a Notice of Borrowing which conforms with Section 1.2 hereof.

5A.17 [Intentionally omitted]

5A.18 <u>Survey/Plat Map</u>. DFC shall have received a satisfactory Project survey or recorded plat map.

5A.19 <u>Escrow Instructions</u>. DFC shall have received evidence that all requirements set forth in the Escrow Instructions, if applicable, shall have been satisfied.

5A.20 <u>Site Visit.</u> DFC shall have conducted a satisfactory site visit.

5A.21 [Intentionally omitted]

All documents, agreements, certificates, financial statements, legal opinions, analyses, reports and other papers required to be delivered shall be in form and substance satisfactory to DFC in its sole discretion and shall be delivered to DFC at its address set forth above or as DFC may otherwise direct. DFC also has the right to require any other further conditions precedent, documents, agreements, certificates, financial statements, legal opinions, analyses, reports and other papers prior to making the Loan in DFC's sole discretion. DFC also has the right to require any other further conditions precedent, documents, agreements, certificates, financial statements, legal opinions, analyses, reports and other papers prior to making the Loan in DFC's sole discretion.

Section 5B. <u>CONDITIONS PRECEDENT TO SUBSEQUENT LOANS.</u>

On and after the Closing Date, DFC shall not be obligated to make a subsequent Loan hereunder unless on the date of the making of the Loan the following conditions have been fulfilled to the satisfaction of DFC in its sole satisfaction:

5B.1 <u>MAI Appraisal</u>. DFC shall have received a satisfactory MAI Project appraisal.

5B.2 <u>Title Updates and Lien Waivers</u>. DFC shall have received any title updates and lien waivers requested.

8

5B.3    Additional Requirements.  DFC shall have received any documents and/or assurances reasonably required by it in connection with the subsequent Loan.

All documents, agreements, certificates, financial statements, legal opinions, analyses, reports and other papers required to be delivered shall be in form and substance satisfactory to DFC in its sole discretion and shall be delivered to DFC at its address set forth above or as DFC may otherwise direct.  DFC also has the right to require any other further conditions precedent, documents, agreements, certificates, financial statements, legal opinions, analyses, reports and other papers prior to making a subsequent Loan in DFC's sole discretion.  DFC also has the right to require any other further conditions precedent, documents, agreements, certificates, financial statements, legal opinions, analyses, reports and other papers prior to making a subsequent Loan in DFC's sole discretion.

Section 6.    AFFIRMATIVE COVENANTS.

The Borrower and the Guarantor hereby covenant and agree hereby that, so long as this Agreement is in effect and until such time as the Loan, together with interest, fees and all other obligations incurred hereunder, are paid in full, the Borrower and the Guarantor will perform, and will cause each of its Subsidiaries to perform, the obligations set forth on Schedule 6, a copy of which is attached hereto and is hereby incorporated by reference.

Section 7.    NEGATIVE COVENANTS.

The Borrower and the Guarantor covenant and agree that, so long as this Agreement is in effect and until such time as the Loan, together with interest, fees and all other obligations incurred hereunder, are paid in full, the Borrower and the Guarantor will perform, and will cause each of its Subsidiaries to perform, the obligations set forth in on Schedule 7, a copy of which is attached hereto and is hereby incorporated by reference.

Section 8.    EVENTS OF DEFAULT.

Upon the occurrence of any of the following specified events (each an "Event of Default"):

8.1    Principal and Interest.  The Borrower shall default in the due and punctual payment of (a) any principal due on any Loan or the Credit Note; (b) any interest on any Loan or the Credit Note; or (c) any fees or other amounts due hereunder; or

8.2    Representations and Warranties.  Any representation, warranty or statement made by the Borrower or officer thereof in any Loan Document to which such Person is a party or otherwise in writing by such Person in connection with any of the foregoing, or in any certificate or other statement furnished pursuant to or in connection with any of the foregoing, shall be breached or shall prove to be untrue in any material respect on the date as of which made or deemed to be made; or

9

8.3     Negative Covenants.  The Borrower shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to the terms of this Agreement or any other Loan Document; or

8.4     Other Covenants.  The Borrower shall default in the due performance or observance of any term, covenant or agreement on its part to be performed or observed pursuant to any of the provisions of this Agreement or any Loan Document (and such default (which shall be capable of cure) shall continue unremedied for a period of 30 days after the earlier of the date on which (i) DFC gives the Borrower notice thereof, or (ii) any executive officer of the Borrower becomes aware thereof; or

8.5     Other Obligations.  Any indebtedness of the Borrower (i) shall be duly declared to be or shall become due and payable prior to the stated maturity thereof, or (ii) in respect of indebtedness in excess of $100,000 in an aggregate principal amount, shall not be paid as and when the same becomes due and payable including any applicable grace period, or there shall occur and be continuing any event which constitutes an event of default under any instrument, agreement or evidence of indebtedness relating to any indebtedness of the Borrower in excess of $100,000 in aggregate principal amount, the effect of which is to permit the holder or holders of such instrument, agreement or evidence of indebtedness, or a trustee, agent or other representative on behalf of such holder or holders, to cause the indebtedness evidenced thereby to become due prior to its stated maturity; or

8.6     Insolvency.  The Borrower shall dissolve or suspend or discontinue its business, or shall make an assignment for the benefit of creditors or a composition with creditors, shall be unable or admit in writing its inability to pay its debts as they mature, shall file a petition in bankruptcy, shall become insolvent (howsoever such insolvency may be evidenced), shall be adjudicated insolvent or bankrupt, shall petition or apply to any tribunal for the appointment of any receiver, liquidator or trustee of or for it or any substantial part of its property or assets, shall commence any proceedings relating to it under any bankruptcy, reorganization, arrangement, readjustment of debt, receivership, dissolution or liquidation law or statute of any jurisdiction, whether now or hereafter in effect; or there shall be commenced against the Borrower any such proceeding which shall remain undismissed for a period of 60 days or more, or any order, judgment or decree approving the petition in any such proceeding shall be entered; or the Borrower shall by any act or failure to act indicate its consent to, approval of or acquiescence in, any such proceeding or in the appointment of any receiver, liquidator or trustee of or for it or any substantial part of its property or assets, or shall suffer any such appointment to continue undischarged or unstayed for a period of 60 days or more; or the Borrower shall take any action for the purpose of effecting any of the foregoing; or any court of competent jurisdiction shall assume jurisdiction with respect to any such proceeding or a receiver or trustee or other officer or representative of a court or of creditors, or any court, governmental officer or agency, shall under color of legal authority, take and hold possession of any substantial part of the property or assets of the Borrower; or

8.7     Security Documents.  The breach by the Borrower of any term or provision

10

of any Security Document to which it is a party, which default in the judgment of DFC is material, or if any such Security Document is at any time not in full force and effect; or any of the Security Documents shall fail to grant to DFC the Liens (if any) intended to be created thereby; or DFC does not hold a perfected first priority lien on the Collateral; or

      8.8    Judgments. Any final non-appealable judgment for the payment of money in excess of $100,000 (after giving effect to any amount covered by insurance as to which the insurer shall not have denied or questioned its obligation to pay) shall be rendered against the Borrower; or

      8.9    Environmental Problems. The Borrower incurs, or (in the opinion of DFC) is reasonably expected to incur, in connection with environmental problems (relating to cleanup costs, as judgments, penalties for cleanup, or otherwise) in excess of $100,000 in the aggregate during any three-year period;

then, and in any such event, and at any time thereafter, if any Default of Event of Default shall then be continuing, DFC may, in addition to all other rights and remedies provided under the Uniform Commercial Code, which rights shall be cumulative, declare the principal of and accrued interest on the Loan to be, whereupon the same shall forthwith become, due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower and Guarantor. Upon the occurrence of a Default or an Event of Default, the Borrower and Guarantor hereby irrevocably make, constitute and appoint DFC (and all officers, employees or agents designated by DFC) as the Borrower's and the Guarantor's true and lawful attorney-in-fact for the purpose of making, settling and adjusting claims under all the Borrower's policies of insurance, endorsing the name of Borrower on any check, draft, instrument or other item of payment received by the Borrower or DFC pursuant to any such policies of insurance and for making all determinations and decisions with respect to such policies of insurance.

      Section 9.    REPRESENTATIONS AND WARRANTIES.

      In order to induce DFC to enter into this Agreement and to make the Loan provided for herein, the Borrower and the Guarantor, jointly and severally, make the representations, covenants and warranties set forth on Schedule 9, a copy of which is attached hereto and hereby incorporated by reference, both as of the date hereof and (after giving effect to the other transactions contemplated hereby to occur on the Closing Date) as of the Closing Date (unless otherwise specified), which representations, covenants and warranties shall survive the execution and delivery of this Agreement and the other documents and instruments referred to herein.

      Section 10.    MISCELLANEOUS.

      10.1    Calculations and Financial Data. Calculations hereunder (including, without limitation, calculations used in determining, or in any certificate of the Borrower delivered reflecting, compliance by the Borrower with the provisions of this Agreement) shall be made and financial data required hereby shall be prepared both as to classification of items and as to amount

11

in accordance with GAAP.

      10.2    <u>Amendment and Waiver</u>. Except as otherwise provided, no provision of any of the Loan Documents may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by DFC and (if the Borrower is a party thereto) the Borrower, except that waivers of provisions relating to the Borrower's performance or non-performance of its obligations hereunder or thereunder need not be signed by the Borrower. Any such change, waiver, discharge or termination shall be effective only in the specific instance and for the specific purposes for which made or given.

      10.3    <u>Expenses; Indemnification</u>.

      (i)    Whether or not the transactions hereby contemplated shall be consummated, the Borrower shall pay all reasonable out-of-pocket costs and expenses of (a) DFC incurred in connection with the preparation, execution, delivery, administration, filing and recording of, this Agreement and the Loan Documents and any document necessary in connection therewith, and (b) DFC incurred in connection with the amendment (including any waiver or consent) or modification of (including any amendment, waiver, consent or modification at any time requested by the Borrower, whether or not same is finalized or executed), and enforcement of or preservation of any rights under, this Agreement, the other Loan Documents, the making and repayment of the Loan, and the payment of all interest and fees, including, without limitation, (i) the reasonable fees and expenses of counsel for DFC, and any special or local counsel retained by DFC, and with respect to enforcement, the reasonable fees and expenses of counsel for DFC, (ii) the reasonable fees and expenses of consultants and appraisers retained by DFC in connection with the transactions contemplated hereunder, and (iii) printing, travel, title insurance, mortgage recording, filing, communication and signing taxes and costs.

      (ii)    The Borrower agrees to indemnify, pay and hold harmless DFC, any DFC Assignee and any holder of the Credit Note and their respective present and future officers, directors, employees and agents (collectively, the "<u>Indemnified Parties</u>") from and against all liability, losses, damages and expenses (including, without limitation, legal fees and expenses) arising out of, or in any way connected with, or as a result of (a) the execution and delivery of this Agreement, the other Loan Documents, the other agreements or the documents or transactions contemplated hereby and thereby or the performance by the parties hereto or thereto of their respective obligations hereunder and thereunder or relating thereto; or (b) any claim, action, suit, investigation or proceeding (in each case, regardless of whether or not the Indemnified Party is a party thereto or target thereof) in any way relating to the Borrower or any Collateral in respect of this Agreement, any other Loan Documents or any other document or transaction in connection herewith or therewith or relating thereto; or (c) any actual or alleged violation by Borrower (or any predecessor in interest of the Borrower) of any Environmental Law, any Environmental Claim or Environmental Cost or the imposition of any Environmental Lien, or any breach of any covenant set forth in Section 6.14 or any representation or warranty set forth in Section 10.11; <u>provided that</u> the Borrower shall not be liable to an Indemnified Party for any portion of such liabilities, losses,

12

damages and expenses sustained or incurred as a direct result of the gross negligence or willful misconduct of DFC or such Indemnified Party if such gross negligence or willful misconduct is determined to have occurred by a final and non-appealable decision of a court of competent jurisdiction. No Indemnified Party shall be entitled to any indirect or consequential damages.

(iii)    All obligations provided for in this Section 10.3, Section 3 and Section 4.2 shall survive any termination of this Agreement and the Commitment and the payment in full of the Loan.

10.4    Benefits of Agreement; Descriptive Headings/Consent to Participation.

This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns, and, in particular, shall inure to the benefit of the holders from time to time of the Notes; provided, however, that the Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of DFC and any such purported assignment or transfer shall be void. In furtherance of the foregoing, DFC shall be entitled at any time to grant participations in the whole or any part of its rights and/or obligations under this Agreement, the Loan Documents or the Loan or Credit Note to any Person. The Borrower agrees and consents to DFC's sale or transfer, whether now or later, of one or more participation interest in the Loan to one or more participants, whether related or unrelated to DFC. Any such participant is referred to in this Agreement as a "DFC Assignee". The Borrower agrees that the provisions hereof shall run to the benefit of each DFC Assignee and its participations or interests herein, and DFC may enforce such provisions on behalf of any such DFC Assignee; provided, however, that if DFC grants a participation in the whole or any part of its rights and/or obligations pursuant to this Section 10.4, then the amounts that the Borrower is required to pay pursuant to this Agreement shall not exceed the amounts that the Borrower would have been required to pay to DFC pursuant to this Agreement had DFC not granted such participation. The Borrower hereby further agrees that any such DFC Assignee may, to the fullest extent permitted by applicable law, exercise the right of setoff with respect to such participation (and in an amount up to the amount of such participation) as fully as if such DFC Assignee were the direct creditor of the Borrower. Upon a participation in accordance with the foregoing, the Borrower shall execute such documents and do such acts as DFC may reasonably request to effect such assignment. DFC may furnish any information concerning the Borrower in its possession from time to time to DFC Assignees (including prospective DFC Assignees) and prospective purchasing banks, and the Borrower herby waives any rights to privacy it may have with respect to such matters. The Borrower additionally waives any and all notices of sale of participation interests, as well as notices of any repurchase of such participation interests. The Borrower also agrees that the purchasers of any such participation interests shall be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. The Borrower further waives all rights of offset or counterclaim that it may have now or later against DFC or against any purchaser of such a participation interest and unconditionally agrees that either DFC or such purchaser may enforce the Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any

13

interest in the Loan. The Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against DFC.

10.5 <u>Notices, Requests, Demands, etc.</u> Except as otherwise expressly provided herein, all notices, requests, demands or other communications to or upon the respective parties hereto shall be deemed to have been duly given or made when delivered (if sent by Federal Express or other similar overnight delivery service), or three Business Days after mailing (when mailed, postage prepaid, by registered or certified mail, return receipt requested) or (in the case of telex, telegraphic, telecopier or cable notice) when delivered to the telex, telegraph, telecopier or cable company, or (in the case of telex or telecopier notice sent over a telex or telecopier owned or operated by a party hereto) when sent; in each case addressed as follows, except that notices and communications to DFC pursuant to Sections 1 and 8 shall not be effective until received by DFC: (i) if to DFC, at the Closing Office and (ii) if to the Borrower, at its address specified with its signature below (Attention: President), or to such other addresses as any of the parties hereto may hereafter specify to the others in writing, provided that communications with respect to a change of address shall be deemed to be effective when actually received.

10.6 <u>Governing Law.</u> THIS AGREEMENT AND THE OTHER LOAN DOCUEMNTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE COMMONWEALTH OF MASSACHUSETTS APPLICABLE TO CONTRACTS EXECUTED WHOLLY WITHIN MASSACHUSETTS WITHOUT REFERENCE TO CHOICE OF LAW DOCTRINE THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION, except (as to any other Loan Document) to the extent specifically set forth otherwise in that Loan Document.

10.7 <u>Counterparts; Telecopies.</u> This Agreement and the other Loan Documents may be executed in any number of counterparts, and by the different parties hereto and thereto on the same or separate counterparts, each of which when so executed and delivered shall be deemed to be an original; all the counterparts for each such Loan Document shall together constitute one and the same agreement. Telecopied signatures hereto and to the other Loan Documents shall be of the same force and effect as an original of a manually signed copy.

10.8 <u>Waiver.</u> No failure or delay on the part of DFC in exercising any right, power or privilege under this Agreement or any other Loan Document, and no course of dealing between the Borrower and DFC shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, power or privilege. The rights and remedies herein expressly provided are cumulative and not exclusive of any rights or remedies which DFC would otherwise have pursuant to such documents or at law or equity. No notice to or demand on the Borrower in any case shall entitle the Borrower to any other or further notice or demand in similar or other circumstances or constitute a waiver of the right of DFC to any other or further action in any circumstances without notice or demand.

14

10.9     Recoveries; Pro Rata Sharing.  Any Recoveries (after deduction and payment of all expenses and costs permitted by this Agreement, the Security Documents or applicable law) shall be applied against the Loan held by DFC until satisfaction in full of all amounts due thereunder.

10.10   Jurisdiction.  THE BORROWER AND THE GUARANTOR HEREBY AGREE THAT ANY LEGAL ACTION OR PROCEEDING AGAINST IT WITH RESPECT TO THIS AGREEMENT, THE LOAN, THE CREDIT NOTE OR ANY OF THE OTHER LOAN DOCUMENTS OR THE DOCUMENTS DELIVERED IN CONNECTION HEREWITH OR THEREWITH MAY BE BROUGHT IN THE COURTS OF THE COMMONWEALTH OF MASSACHUSETTS OR THE UNITED STATES OF AMERICA FOR THE WESTERN DISTRICT OF MASSACHUSETTS AS DFC MAY ELECT, and, by execution and delivery hereof, the Borrower and the Guarantor accept and consent for itself and in respect to its property, generally and unconditionally, the jurisdiction of the aforesaid courts and agrees that such jurisdiction shall be exclusive, unless waived by DFC in writing, with respect to any action or proceeding brought by it against DFC and any questions relating to usury.  The Borrower waives any right to stay or to dismiss any action or proceeding brought before said courts on the basis of forum non conveniens.  The Borrower and the Guarantor hereby irrevocably consent that all process served or brought against it with respect to any such proceeding in any such court in Massachusetts shall be effective and binding service in every respect if sent by registered mail, or (if permitted by law) by Federal Express or other similar overnight courier service, to the Borrower at its address set forth alongside its signature below or such other address as DFC is notified of in accordance with the provisions of this Agreement.  Nothing herein shall affect the right of DFC to serve process in any other manner permitted by law or shall limit the right of DFC to bring proceedings against the Borrower and the Guarantor in the courts of any other jurisdiction.

10.11   Severability.  If any provision of this Agreement shall be held or deemed to be or shall, in fact, be illegal, inoperative or unenforceable, the same shall not affect any other provision or provisions herein contained or render the same invalid, inoperative or unenforceable to any extent whatever.

10.12   Right of Set-off.  In addition to any rights now or hereafter granted under applicable law or otherwise and not by way of limitation of any such rights, upon the occurrence of an Event of Default DFC is hereby authorized at any time or from time to time, without notice to the Borrower and the Guarantor or to any other Person, any such notice being hereby expressly waived, to set-off and to appropriate and apply any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness at any time held or owing by DFC to or for the credit or the account of the Borrower against and on account of the obligations and liabilities of the Borrower now or hereafter existing under any of the Loan Documents irrespective of whether or not any demand shall have been made thereunder and although said obligations, liabilities or claims, or any of them, shall be contingent or unmatured.

10.13   No Third Party Beneficiaries.  This Agreement is solely for the benefit of the

15

DFC, the Borrower and their respective successors and assigns (except as otherwise expressly provided herein) and nothing contained herein shall be deemed to confer upon anyone other than DFC and its successors and assigns and the Borrower any right to insist on or to enforce the performance or observance of any of the obligations contained herein. All conditions to the obligations of DFC to make the Loan hereunder are imposed solely and exclusively for the benefit of DFC and its successors and assigns and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms and no other Person shall under any circumstances be deemed to be beneficiary of such conditions.

10.14 <u>Effectiveness</u>. This Agreement shall become effective when and as of the date (the "<u>Effective Date</u>") that all of the parties hereto shall have signed a copy hereof (whether the same or different counterparts) and shall have delivered the same to DFC.

10.15 <u>Survival; Integration</u>.

(i) Each of the representations, warranties, terms, covenants, agreements and conditions contained in this Agreement shall specifically survive the execution and delivery of this Agreement and the other Loan Documents and the making of the Loan and shall, unless otherwise expressly provided, continue in full force and effect until the Loan together with interest thereon, the fees and compensation of DFC, and all other sums payable hereunder or thereunder have been indefeasibly paid in full.

(ii) This Agreement, together with the other Loan Documents comprises the complete and integrated agreement of the parties on the subject matter hereof and thereof and supersedes all prior agreements, written or oral, on the subject matter hereof and thereof. In the event of any direct conflict between the provisions of this Agreement and those of any other Loan Document, the provisions of this Agreement shall control and govern; <u>provided</u> that the inclusion of supplemental rights or remedies in favor of DFC in any other Loan Document shall not be deemed a conflict with this Agreement. Each Loan Document was drafted with the joint participation of the respective parties thereto and shall be construed neither against nor in favor of any party, but rather in accordance with the fair meaning thereof.

10.16 <u>Domicile of the Loan</u>. DFC may make, maintain or transfer the Loan hereunder to, or for the account of, any Subsidiary or Affiliate of DFC.

10.17 <u>No Usury</u>. It is expressly stipulated and agreed to be the intent of DFC and the Borrower to comply at all times with applicable usury laws. If at any time such laws would ever render usurious any amount called for under any of the Loan Documents, then it is the express intention of the parties hereto that such excess amount be immediately credited on the Credit Note, or if the Credit Note has been fully paid, refunded by DFC, to the Borrower (and the Borrower shall accept such refund) and the provisions hereof and thereof be immediately deemed to be reformed to comply with the then applicable laws, without the necessity of the execution of any further documents, but so as to permit the recovery to the fullest amount otherwise called for hereunder and thereunder. Any such crediting or refunding shall not cure or waive any default by the Borrower

16

under the Loan Documents. If at any time following any such reduction to the interest rate payable by the Borrower there remains unpaid any principal amounts under the Credit Note and the maximum interest rate permitted by applicable law is increased or eliminated, then the interest rate payable to DFC shall be readjusted, to the full extent permitted by applicable law, so that the total amount of interest thereunder payable by the Borrower to the DFC shall be equal to the amount of interest which would have been paid by the Borrower without giving effect to applicable usury laws. The Borrower agrees, however, that in determining whether or not any interest payable under the Notes or any of the other Loan Documents exceeds the highest rate permitted by law, any non-principal payment (except payments specifically stated in the Credit Note or such other Loan Documents to be "interest"), including any expenses and fees and all other sums payable hereunder or thereunder or in connection herewith or therewith, shall be deemed, to the full extent permitted by law, to be an expense, fee, premium or penalty rather than interest. To the extent that A.R.S. § 44-1201 shall be applicable thereto, the rate of interest contracted for in writing shall be the sum of the stated rate of interest in the Note and any other amounts paid by or on behalf of Borrower to Lender which a court of competent jurisdiction may determine to be interest or in the nature of interest.

10.18    Waiver of Jury Trial. EACH OF THE BORROWER, THE GUARANTOR AND DFC HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY AND ALL RIGHTS IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH, THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF THE BORROWER, GUARANTOR OR DFC. THIS PROVISION IS A MATERIAL INDUCEMENT FOR DFC ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS.

10.19    Full Recourse and Guarantee. The Borrower hereby acknowledges that the Obligations of the Borrower hereunder and under the Loan Documents are full recourse obligations of the Borrower which are fully and unconditionally guaranteed by the Guarantor, and that DFC may look to each and every asset of the Borrower and/or the Guarantor for payment of the Obligations notwithstanding the existence of the Guarantee or the delivery of security to DFC hereunder or under any other Loan Document.

10.20    Cross-Default and Cross-Collateralization. Any Default or Event of Default under this Agreement or any other Loan Document executed in connection herewith, or any other Obligation from Borrower to DFC shall be deemed a default or event of default under any and/or all of the other loans or agreements with DFC or its Affiliates and/or Subsidiaries, and any default or event of default by the Borrower or any Affiliate or Subsidiary under any of the other loans or agreements with DFC or its Affiliates and/or Subsidiaries shall be deemed a Default or Event of Default hereunder. All Collateral for the Loan shall collateralize all other obligations of the Borrower and its Affiliates and Subsidiaries to DFC and its Affiliates and/or Subsidiaries, and all other collateral for any other obligations owed by the Borrower and its Affiliates and Subsidiaries to

17

DFC and its Affiliates and/or Subsidiaries shall be deemed collateral hereunder. DFC, at its option, may exercise any of its rights and remedies under any agreement, including but not limited to retention of and/or application of funds on any purchased receivables and/or any other collateral under any such agreement or the Collateral hereunder.

   **IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed and delivered by their respective duly authorized officers as of the date first above written.

      **BORROWER:**

      **SEDONA DEVELOPMENT PARTNERS, LLC**

      **BY: SEVEN CANYONS INVESTORS, LLC**
        **Its Managing Member**

      **BY: CAVAN MANAGEMENT SERVICES, LLC,**
        **Its Managing Member**

      By: _____
      Name:   Thomas P Kell
      Title:    President

      **GUARANTOR:**

      **CAVAN MANAGEMENT SERVICES, LLC**

      By: _____
      Name:   Thomas P Kell
      Title:    President

      **DEVELOPER FINANCE CORPORATION**
      By: _____
      Its: _____Vice President_____

# Exhibit 1

## DEFINITIONS

As used in the Loan Agreement to which this <u>Exhibit 1</u> is annexed, the following terms shall have the meanings herein specified or as specified in the Section of such Loan Agreement or in such other document herein referenced:

"<u>Advance</u>" shall mean the proceeds of each Loan advanced by DFC in accordance with the terms of this Agreement.

"<u>Advance Fee</u>" shall mean an amount equal to one percent (1%) of the principal amount of each Advance.

"<u>Additional Collateral Property</u>" shall mean Tract C located at the Project.

"<u>Affiliate</u>", as to any Person, shall mean any other Person directly or indirectly controlling, controlled by or under common control with, such Person. Unless otherwise indicated, references to "Affiliate" shall refer to Affiliates of the Borrower.

"<u>Agreement</u>" or "<u>Loan Agreement</u>" shall mean this Credit Agreement as it may from time to time be amended, extended, restated, supplemented or otherwise modified.

"<u>Auditors</u>" shall mean independent certified public accountants of recognized standing selected by the Borrower and satisfactory to the DFC.

"<u>Borrowing Date</u>" - Section 1.2.

"<u>Borrowing Period</u>" shall mean the period commencing on the Closing Date and ending sixty (60) days thereafter, unless sooner terminated.

"<u>Business Day</u>" shall mean any day excluding Saturday, Sunday and any day on which banks in Massachusetts are authorized by law or other governmental action to close.

"<u>CFO</u>", as to the Borrower, shall mean the Borrower's chief financial officer or such other person designated by the Borrower's board of directors to certify financial reports and statements on behalf of the Borrower.

"<u>Charter Document</u>" shall mean (i) with respect to a corporation: its certificate or articles of incorporation or association and its by-laws or comparable documents under non-US laws; (ii) with respect to a partnership: its partnership agreement, certificate of partnership (if a limited partnership) and its certificate of doing business under an assumed name (if a general partnership); (iii) with respect to a trust, its trust agreement or declaration of trust; and (iv) with respect to a limited liability company, its certificate of formation and limited liability company agreement or analogous documents; in each case, with such other similar documents as DFC shall request or specify.

"<u>Closing Date</u>" shall mean the date of the making of the initial Loan hereunder.

"Closing Office" shall mean the office of DFC at 430 Main Street, Suite 3, Williamstown, Massachusetts or such other office as may be designated in writing to the Borrower by DFC.

"Code" shall mean the Internal Revenue Code of 1986, as the same may be amended from time to time.

"Collateral" See Sections 1.6 and 9.14 on Schedule 9. Without limiting the generality of the foregoing, the term "Collateral" shall also include all other real property and personal property and interests therein granted or purported to be granted as security to DFC pursuant to any Security Document, whether before, on or after the Closing Date and a first position collateral assignment of all construction contracts and documents related to Project construction and development.

"Commitment" shall mean the Credit Loan Commitment.

"Credit Loan Commitment" shall mean Three Million Dollars ($3,000,000.00), which amount shall include the Interest Reserve to be funded on the Closing Date.

"Credit Maturity Date" shall mean the date which is twelve (12) months from the Closing Date, or such earlier date as provided in the Agreement; provided, however, that DFC in its sole and absolute discretion may decide to extend the Credit Maturity Date for another twelve (12) months upon payment of the Extension Fee.

"Credit Note" shall mean the promissory note of the Borrower, as such note may from time to time be amended, restated, supplemented or otherwise modified.

"Default" shall mean any event which with notice or lapse of time, or both, would become an Event of Default.

"Dollars", "U.S. $", "$" and "U.S. dollars" shall mean the lawful currency of the United States of America.

"Effective Date" - Section 10.14.

"Event of Default" shall mean each of the Events of Default defined in Section 8.

"Extension Fee" shall mean 1% of the Credit Loan Commitment.

"Fiscal Year" shall mean the period from January 1 through December 31 of any calendar year.

"Fiscal Year-End" shall mean, with respect to any Person, the last day of such Person's Fiscal Year.

"GAAP" shall mean generally accepted accounting principles (as promulgated by the Financial Accounting Standards Board or any successor entity).

"Government Authority" shall mean any nation or government, any state or

political subdivision thereof and any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guarantee" shall mean the Guarantee of the Guarantor.

"Guarantor" shall mean Cavan Management Services, LLC.

"Indebtedness for Borrowed Money" shall mean (without duplication) (i) all indebtedness of (including, without limitation, all indebtedness assumed by) a Person in respect of money borrowed (including, without limitation, the unpaid amount of the purchase price of any property, incurred for such purpose in lieu of borrowing money or using available funds to pay said amount, and not constituting an account payable or expense accrual incurred or assumed in the ordinary course of business), or evidenced by a promissory note, bond, debenture or other like obligation to pay money, and including indebtedness under banker's acceptances and with respect to letters of credit, (ii) net obligations under interest rate swap, hedges, caps or similar contracts, or currency exchange or currency risk avoidance agreements, and (iii) all obligations of (including, without limitation, all obligations assumed by) a Person (x) constituting a capitalized lease obligation of such Person, or (y) constituting a guarantee by such Person.

"Indemnified Party" - Section 10.3(ii).

"Interest Rate" means a per annum interest rate equal to the sum of the Reference Rate, as in effect from time to time, plus four percent (4%), but in no event less than thirteen percent (13%).

"Interest Reserve"- Section 2.4.

"IRS" shall mean the Internal Revenue Service of the United States.

"Late Fee" has the meaning set forth in Section 3.3 hereof.

"Legal Requirements" shall mean, with respect to any Person, all laws, common law, statutes, rules and regulations of any Government Authority to which such Person or any of its assets is subject or any judgment, decree, franchise, order or permit of any Government Authority applicable to such Person or any of its assets.

"Lien" shall mean any mortgage, deed of trust, security deed, pledge, security interest, encumbrance, lien or other charge of any kind or any other agreement or arrangement having the effect of conferring security (including any agreement to give any of the foregoing, any assignment or lease in the nature thereof, and any conditional sale or other title retention agreement), any lien arising by operation of law, and the filing of or agreement to give any financing statement under the Uniform Commercial Code of any jurisdiction (or any similar or comparable law of any jurisdiction that has not enacted the Uniform Commercial Code).

"Loan" shall mean each Advance hereunder.

"Loan Documents" shall mean, individually and collectively, this Agreement, the

Credit Note, the Guarantee, the Security Documents, the Legal Opinion, the Mortgage, and all other instruments and agreements executed in connection herewith and therewith, in each case as amended, restated, supplemented or otherwise modified from time to time. Without limiting the generality of the foregoing, each amendment to (or constituting part of) the Agreement or any other Loan Document and each instrument and agreement (including, without limitation, waivers) executed in connection with any Loan Document shall be deemed to be a Loan Document for all purposes of the Agreement and the other Loan Documents.

"Lot" means, in the event that Borrower subdivides the Property or the Additional Collateral Property, each of the residential/recreational lots and subdividable parcels located in the Property and Additional Collateral Property.

"Material Adverse Change" in respect of a Person shall mean a material adverse change in (i) the business, properties, operations, prospects or condition (financial or otherwise) of such Person or (ii) if such Person is the Borrower, the ability of the Borrower to perform, or of DFC to enforce, the Obligations.

"Material Adverse Effect" in respect of a Person shall mean an effect that would result in a Material Adverse Change.

"Material Agreement" shall mean all outstanding contracts, agreements, leases and other understandings to which the Borrower is a party, or by or under which either has any rights or obligations, which (i) involve the payment to or by the Borrower of an aggregate of $100,000 or more or (ii) is otherwise material to the Borrower.

"Mortgage" shall mean the Mortgage, Deed of Trust or other security instruments creating a first lien on the Property, Additional Collateral Property, Lots, and certain related property, financed by DFC pursuant hereto.

"Net Worth" of a Person shall mean such Person's assets less its liabilities, all determined in accordance with GAAP.

"Notice of Borrowing" - Section 1.2(a).

"Obligations" shall mean all obligations of the Borrower with respect to the repayment or performance of its obligations (monetary or otherwise) arising under or in connection with the Loan, this Agreement, the Credit Note and each other Loan Document.

"Obligor" means each Borrower, each Guarantor, and any other Person who is or who may become obligated under, with respect to, or on account of the Obligations whether as the maker thereof or as a Guarantor thereto, or otherwise.

"Past-Due Rate" - Section 2.3.

"Person" shall mean and include an individual, a partnership, a corporation (including a business trust), a joint stock company, a limited liability company, the Consolidated Group, a trust, a land trust, an unincorporated association, a joint venture or other entity or a government or an agency or political subdivision thereof.

"Project" shall mean the Borrower's mixed use development real estate project approved by DFC comprising approximately 130 acres known as Seven Canyons Resort, located in Yavapai County, Arizona.

"Property" shall means Tracts C and D of Sedona at Seven Canyons, Unit 2.

"Recoveries" shall mean any funds, or substitution of receipts or collateral, received by DFC (a) from the sale, collection or other disposition of Collateral pursuant to the Security Documents, or (b) from any distribution to DFC, or abandonment to any of them, or substitute Liens or payment given to any of them pursuant to events or proceedings of the nature, which distribution or abandonment pertains to the Collateral.

"Reference Rate" shall mean that rate of interest which is designated daily by the Wall Street Journal, Eastern Edition, as the nation's average "prime interest" rate on corporate loans at large U.S. money center commercial banks. If more than one rate is published by the Wall Street Journal as the "prime rate", the highest of the published rates shall be used. Should the Wall Street Journal cease reporting said rate of interest, then the Reference Rate shall be deemed that rate of interest designated by Citibank, N.A. or its successors as its "prime rate" of interest.

"Release Payment" shall mean the payment made by the Borrower to DFC in order to secure the release of a Lot from the Lien of the Mortgage as set forth in Section 3.2.

"Requisite Consents" - Section 5A.10.

"Security Documents" shall be the collective reference to (a) each of the agreements referred to in Section 5A.6 hereof pursuant to which Collateral is intended to be granted, directly or indirectly, to DFC, (b) each agreement entered into after the Closing Date pursuant to which Collateral is intended to be granted, directly or indirectly, to DFC, including any and all assignments of contract and other documents related to Project development and construction, and (c) all amendments, supplements or other modifications to such agreements or replacements thereof.

"Solvent" shall mean, with respect to any Person, that the fair saleable value of the property of such Person is, on the date of determination, greater than the total amount of liabilities (including contingent liabilities) of such Person as of such date and that, as of such date, such Person is able to pay all Indebtedness for Borrowed Money of such Person as such Indebtedness for Borrowed Money matures.

"Subsidiary" of any Person shall mean any other firm, corporation, partnership, trust or other unincorporated organization or association or other enterprise, 50% or more of the indicia of equity rights (whether capital stock or otherwise) of which is at the time owned, directly or indirectly, by such Person and/or by one or more of such Person's Subsidiaries. Unless otherwise indicated, references to Subsidiaries shall refer to Subsidiaries (if any) of the Borrower.

"United States," "US" or "U.S." shall mean the United States of America.

"Written," "in writing" and other variations thereof shall mean any form of

written communication or a communication by means of telex, telecopier, telegraph or cable.

<u>Schedule 6</u>

Affirmative Covenants of the Borrower and Guarantor

6.1   <u>Financial Statements</u>.  The Borrower will furnish to DFC:

(a)  Quarterly Financial Reports.  As soon as available and in any event within forty-five (45) days following the end of each calendar quarter, unaudited statements of income and expense of Borrower for the quarterly period in question and balance sheets of Borrower as of the last day of such calendar quarter, all in such detail and scope as may be reasonably required by DFC, prepared in accordance with GAAP or other basis approved by DFC in writing and on a basis consistent with prior accounting periods and certified as true and correct by Borrower's CFO, as appropriate.

(b)  Annual Financial Reports.  As soon as available and in any event within ninety (90) days after the end of Borrower's Fiscal Year, statements of income and expense of Borrower for the annual period ended as of the end of such Fiscal Year, and balance sheets of Borrower as of the end of such Fiscal Year, all in such detail and scope as may be reasonably required by DFC and prepared and reviewed by the Auditors in accordance with GAAP and on a basis consistent with prior accounting periods.  Each annual financial statement of Borrower shall be certified to be true, correct and complete by Borrower's CFO.

(collectively, the "Financial Statements")

6.2   <u>Notice of Litigation</u>.  The Borrower and Guarantor will promptly give written notice to DFC of (i) any action or proceeding, or to the extent any executive officer of Borrower may have any notice thereof, any claim, which may reasonably be expected to be commenced or asserted against the Borrower or Guarantor in which the amount involved is $100,000 or more, (ii) any dispute which may exist between the Borrower and any Government Authority (including any audit by the IRS or environmental claim), and (iii) any dispute which may exist between the Borrower and any employees of such Person or any union representing, claiming to represent or seeking to represent any such employees, which dispute may substantially affect the normal business operations of the Borrower or any of their respective properties and assets.

6.3   <u>Payment of Charges</u>.  The Borrower will duly pay and discharge, and will cause each of its Subsidiaries to duly pay and discharge (i) all taxes, assessments and governmental charges or levies imposed upon or against it or its property or assets, or upon any property leased by it, prior to the date on which penalties attach thereto, unless and to the extent only that such taxes, assessments and governmental charges or levies are being contested in good faith and by appropriate proceedings diligently conducted and the Borrower has set aside on its books adequate reserves therefor in accordance with GAAP, (ii) all lawful claims, whether for labor, materials, supplies, services or anything else, which might or could, if unpaid, become a lien or charge upon such property or assets, unless and to the extent only that the validity thereof is being

contested in good faith and by appropriate proceedings diligently conducted, and (iii) all its trade bills when due in accordance with their original terms, including any applicable grace periods, unless and to the extent only that such trade bills are being contested in good faith and by appropriate proceedings diligently conducted.

6.4   Insurance.

(a)   The Borrower will keep, and will cause each of its Subsidiaries to keep, (i) all of its insurable property insured at all times with financially sound and responsible insurance carriers against loss or damage by fire and other risks, casualties and contingencies and in such manner and to the extent that like properties are customarily so insured by other corporations engaged in the same or similar business similarly situated, and (ii) adequate insurance at all times with financially sound and responsible insurance carriers against liability on account of damage to persons and properties and under all applicable workmen's compensation laws; and

(b)   The Borrower will obtain, and will cause each of its Subsidiaries to obtain, adequate insurance covering such other risks as DFC may reasonably request; and keep, and cause each of its Subsidiaries to keep, such insurance in effect to the extent so requested; and

6.5   Maintenance of Records.  The Borrower will keep, and will cause each of its Subsidiaries to keep, at all times books of record and account in which full, true and correct entries will be made of all dealings or transactions in relation to its business and affairs, and the Borrower will provide, and will cause each of its Subsidiaries to provide, adequate protection against loss or damage to such books of record and account.

6.6   Preservation of Corporate Existence.  The Borrower will maintain and preserve its corporate existence and right to carry on its business and duly procure all necessary renewals and extensions thereof, and maintain, preserve and renew all rights, powers, privileges and franchises which in the opinion of the Board of Directors of the Borrower continue to be advantageous to it and comply in all material respects with all applicable Legal Requirements and, in each such case, cause each of its Subsidiaries so to do. Without limiting the generality of the foregoing, the Borrower agrees to qualify to do business as a foreign corporation in each jurisdiction where the nature of its business and the operations conducted by it therein require it to be so qualified.

6.7   Preservation of Assets.  The Borrower will keep and will cause each of its Subsidiaries so to keep, its property in good repair, working order and condition and from time to time make all needful and proper repairs, renewals, replacements, extensions, additions, betterments and improvements thereto, so that the business carried on by it may be properly and advantageously conducted at all times in accordance with prudent business management.

6.8 <u>Inspection of Books and Assets</u>.

(i)     Upon three (3) Business Days' notice, the Borrower will allow any representative, officer or accountant of DFC to visit and inspect any of its property, to examine its books of record and account and to discuss its affairs, finances and accounts with its officers, and at such reasonable time and as often as DFC may request and, in each such case, cause each of its Subsidiaries so to do.

(ii)    Upon three (3) Business Days' notice, the Borrower will allow any representative, officer or accountant of DFC to discuss the Financial Statements, the other financial information from time to time delivered hereunder and the financial condition of members with the Auditors.

6.9     <u>Payment of Indebtedness</u>.  The Borrower and the Guarantor will duly and punctually pay, or cause to be paid, the principal of and the interest on all Indebtedness for Borrowed Money heretofore or hereafter incurred or assumed by such Person, or in respect of which such Person shall otherwise be liable, when and as the same shall become due and payable, unless such Indebtedness for Borrowed Money be renewed or extended, and will faithfully observe, perform and discharge all the covenants, conditions and obligations which are imposed on such Person by any and all indentures and other agreements securing, relating to, or evidencing such Indebtedness for Borrowed Money or pursuant to which such Indebtedness for Borrowed Money is incurred, and such Person will not permit any act or omission to occur or exist which is or may be declared to be a default thereunder.

6.10    <u>Further Assurances</u>.  The Borrower will, and will cause each of its Subsidiaries to, and the Guarantor will, make, execute or endorse, and acknowledge and deliver or file, all such vouchers, invoices, notices, and certifications and additional agreements, undertakings, conveyances, transfers, assignments, or further assurances, and take any and all such other action, as DFC may, from time to time, deem necessary or proper in connection with this Agreement, the obligations of Borrower and/or or Guarantor hereunder or under the Credit Note, the Guarantee or any of the other Loan Documents to which Borrower or Guarantor is a party, or for the better assuring and confirming unto DFC all or any part of the security for the Obligations.

6.11    <u>Notice of Default</u>.  Forthwith upon Guarantor and/or an executive officer of the Borrower obtaining knowledge of the existence of an Event of Default, the Borrower and/or Guarantor will deliver to DFC a certificate signed by Guarantor and/or an officer of the Borrower specifying the nature thereof, the period of existence thereof, and what action the affected Person proposes to take with respect thereto.

6.12    <u>Reserves</u>.  The Borrower will set up, and will cause each of its Subsidiaries to set up, on its books from its earnings, reserves for bad debt in accordance with GAAP and in an aggregate amount deemed adequate in the judgment of the Borrower and accepted by the Auditors in their annual audits.

6.13　Arms-length Transactions.　The Borrower will conduct and cause each of its Subsidiaries to conduct all transactions with any of their respective Affiliates on an arms-length basis.

6.14　Environmental Matters.　The Borrower and Guarantor will promptly notify DFC (with a description in reasonable detail) of any pending or threatened action or investigation in connection with any applicable environmental law, statute, regulation or ordinance.

6.15　Solvency/Net Worth.　The Borrower will continue to be Solvent.　The Borrower shall maintain at all times a positive net worth as defined by GAAP.

6.16　Compliance with Laws.　The Borrower and Guarantor shall comply in all respects with all federal, state and local laws, statutes, regulations and ordinances.

6.17　Cooperation.　At DFC's request, the Borrower and Guarantor will meet from time to time with (and provide financial information to) other financial institutions to which DFC may wish to grant participations in the Loans, including potential DFC Assignees and potential purchasing banks.

6.18　Assignment of Project Contracts.　The Borrower and the Guarantor agree that DFC shall receive a first priority assignment of any and all construction contracts and related documents in connection with the development and construction of the Project.

6.19　Subordination of Borrower Debt.　All debt of the Borrower to its members, the Guarantor, or to affiliates thereof shall be expressly subordinate to the Loan, provided, however, that said subordinated debt may be repaid as scheduled so long as there is no default or Event of Default hereunder and that such payment would not render the Borrower insolvent or otherwise result in a default or Event of Default.

<u>Schedule 7</u>

Negative Covenants of the Borrower and the Guarantor

7.1     <u>Liens</u>.  Neither the Borrower, the Guarantor nor any Affiliate or Subsidiary thereof shall sell, assign (by operation of law or otherwise) or otherwise dispose of, or create or suffer to exist any Lien upon or with respect to, the Project or any Collateral, other than Liens in favor of DFC and Affiliates and Subsidiaries of DFC.

7.2     <u>Other Indebtedness</u>.  Neither the Borrower nor the Guarantor shall create or suffer to exist any indebtedness of any type whatsoever secured by any interest in the Collateral, except for the indebtedness incurred pursuant to this Agreement and the Loan Documents.

7.3     <u>Consolidation and Merger</u>.  Neither the Borrower nor the Guarantor will wind up, liquidate or dissolve its affairs or enter into any transaction of merger or consolidation (or agree to do any of the foregoing at any future time).

7.4     <u>Sale of Assets.</u>  Neither the Borrower nor the Guarantor will convey, sell, lease or otherwise dispose of (or agree to do any of the foregoing at any future time), any of its assets (other than equipment which is obsolete or no longer used or useful in the conduct of its business) other than in the ordinary course of its business.

7.5     <u>Dividends, Distributions and Purchases of Capital Stock</u>.  Neither the Borrower nor the Guarantor will declare or pay any dividends or distribution to its members, or return any capital to its members or authorize or make any other distribution, payment or delivery of property or cash to its members until such time as the Obligations hereunder are paid and performed in full.

## Schedule 9

### Representations and Warranties of the Borrower and the Guarantor

9.1   Status; Validity.

(i)     Each of the Borrower, the Guarantor and their Subsidiaries is a duly organized and validly existing corporation in good standing under the laws of the jurisdiction of its incorporation and has the corporate power and authority to own or hold under lease its property and assets, to transact the business in which it is engaged, to enter into and perform this Agreement and the other Loan Documents to which it is party, and, as to the Borrower, to borrow hereunder. The Borrower, the Guarantor and their Subsidiaries are duly qualified or licensed as a foreign corporation in good standing in each jurisdiction where failure to so qualify would have a Material Adverse Effect on the Borrower.

(ii)     The execution, delivery and performance by the Borrower and the Guarantor of this Agreement and the other Loan Documents to which it is party and the other documents, agreements or instruments provided for herein and therein to which each is party, the consummation of the transactions contemplated thereunder and the use of the proceeds of the Loans have been duly authorized by all necessary corporate and stockholder action. This Agreement and the other Loan Documents and the other documents, agreements or instruments provided for herein and therein to which each such Person is party are the legal, valid and binding obligations of the Borrower and the Guarantor, enforceable in accordance with their respective terms subject, as to enforceability, to applicable bankruptcy, insolvency, reorganization and similar laws affecting the enforcement of creditors' rights generally and to general principles of equity (regardless of whether such enforcement is considered in a proceeding in equity or at law).

9.2   Compliance with Other Instruments.  Neither the Borrower nor the Guarantor is in material default under any Material Agreement to which it is a party, and neither the execution, delivery or performance of this Agreement and the other Loan Documents nor the consummation of the transactions herein or therein contemplated, nor compliance with the terms and provisions hereof or thereof, will contravene any provision of any Legal Requirement or will conflict or will be inconsistent with or will result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or, except as provided by the Security Documents, result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of such Person pursuant to the terms of any indenture, mortgage, deed of trust or Material Agreement to which such Person is a signatory or by which such Person is bound or to which such Person may be subject or violate any provision of the Charter Documents of such Person.

9.3  Litigation.  There are no actions, suits or proceedings pending or, to the knowledge of the Borrower or the Guarantor, any executive officer of Borrower, threatened, against or affecting the Borrower or the Guarantor, before any Government Authority which, if adversely determined, would have a Material Adverse Effect on the Borrower or the Guarantor.

9.4  Compliance with Law.  Except for matters which could not result in a Material Adverse Change in respect of the Borrower or the Guarantor: a) all business and operations of the Borrower and the Guarantor have been and are being conducted in accordance with all applicable Legal Requirements; b) the Borrower and the Guarantor have obtained all permits, licenses and authorizations, or consents which are otherwise necessary, for such Person to conduct its business as it is conducted; and c) neither the Borrower nor the Guarantor is a party to, has been threatened with, and there are no facts existing as a basis for, any governmental or other proceeding which might result in a suspension, limitation or revocation of any such permit, license or authorization.

9.5  Government Approvals.  No order, permission, consent, approval, license, authorization, registration or validation of, or filing with, or exemption by, any Government Authority is required to authorize, or is required in connection with the execution, delivery and performance of this Agreement, the other Loan Documents by the Borrower or the Guarantor, or the taking of any action hereby or thereby contemplated, except for routine building and other permits which will be obtained in the ordinary course of business.

9.6  Federal Reserve Margin Regulations; Use of Proceeds.

(i)  The Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying any margin stock (within the meaning of Regulation U of the Board of Governors of the Federal Reserve System). No part of the proceeds of any Loan will be used to purchase or carry any such margin stock or to extend credit to others for the purpose of purchasing or carrying any such margin stock.

(ii)  The proceeds of the Loans shall be used solely for the Borrower's working capital needs.

9.7  Taxes.

(i)  All tax returns of any nature whatsoever, including but not limited to, all U.S. income, payroll, stock transfer, and excise tax returns and all appropriate state and local income, sales, excise, payroll, franchise and real and personal property tax returns, and corresponding returns under the laws of any jurisdiction, which are required to be filed by the Borrower and the Guarantor have been or will be filed by the due date or extended due date of such returns.

(ii)     All taxes due and payable with respect to the Borrower and the Guarantor have been paid, and there are no liabilities, interest or penalties payable with respect to any taxes which remain unpaid.

9.8     Investment Company Act, etc.  Neither the Borrower, the Guarantor nor the entering into of the Loan Documents nor the issuance of the Credit Note is subject to any of the provisions of the Investment Company Act of 1940, as amended.  Neither the Borrower nor the Guarantor is a 'holding company' as defined in the Public Utility Holding Company Act of 1935, as amended, or subject to any other federal or state statute or regulation limiting its ability to incur Indebtedness for Money Borrowed.

9.9     Properties of the Borrower.

(i)     The Borrower and the Guarantor have good and marketable title to, or valid leasehold interests in, all of their material properties and assets.

(ii)     The Borrower has full, valid and exclusive right, title and interest the Project and the Borrowers' ownership rights in and to all of the foregoing are subject to no Liens.

(iii)     The Borrower possesses all permits, authorizations, licenses, approvals, waivers and consents without unusual restrictions or limitations, failure of which to possess would have a Material Adverse Effect on the Project or the business, assets, or financial condition of the Borrower, all of which are in full force and effect.

9.10     Financial Condition.

(i)     There has been no Material Adverse Change with respect to the Borrower, the Guarantor and their Subsidiaries.

(ii)     At the time of, and after giving effect to, each Loan, the Borrower and the Guarantor (a) are Solvent, and (b) Borrower possesses sufficient capital to conduct the business in which it is engaged or presently proposes to engage.

9.11     Environmental Matters.  The Borrower (and any predecessor in interest of Borrower) has been and continues to be in material compliance with all applicable environmental laws, statutes, regulations and ordinances.

9.12     Disclosure.  Neither this Agreement or any Loan Document nor any statement, list, certificate or other document or information, or any schedules to this Agreement or any other

Loan Document, delivered or to be delivered to the DFC, contains or will contain any untrue statement of a material fact or omits or will omit to state a material fact necessary to make statements contained herein or therein, in light of the circumstances in which they are made, not misleading.

9.13   Intentionally deleted.

9.14   <u>Collateral</u>.  This Agreement and each Security Document when delivered will grant a valid and enforceable security interest or lien in the Collateral and when such Security Documents or financing statements with respect thereto are filed and recorded as required by the Uniform Commercial Code, will be superior and prior to the rights of all third Persons now existing or hereafter arising whether by way of mortgage, pledge, lien, security interest, encumbrance or otherwise.  All such action as is necessary in law has been taken, or prior to the Closing Date will have been taken, to establish and perfect the security interest of DFC in the Collateral and to entitle DFC to exercise the rights and remedies provided in each of the Security Documents and the UCC, as applicable, and no filing, recording, registration or giving of notice or other action is required in connection therewith except such as has been made or given or will have been made or given prior to such date.  All filing and other fees or other tax payable with respect to the recording of any of the Security Documents and UCC financing statements have been paid or provided for.

9.15   <u>Qualification</u>.

        (i)       Solely by reason of (and without regard to any other activities of DFC in any state in which Collateral is located) the entering into, performance and enforcement of this Agreement, the Notes, the Security Documents and the other Loan Documents by DFC will not constitute doing business by DFC in any of such state or result in any liability of DFC for taxes or other governmental charges (excluding income taxes); and qualification by DFC to do business in such jurisdiction is not necessary in connection with, and the failure to so qualify will not affect, the enforcement of, or exercise of any rights or remedies under, any of such documents.

        (ii)      No "business activity," "doing business" or similar report or notice is required to be filed by DFC in any such jurisdiction in connection with the Loans or the transactions contemplated by this Agreement, and the failure to file any such report or notice will not affect the enforcement of, or the exercise of any rights or remedies under, this Agreement, the Security Documents or any of the other Loan Documents.

PHX/1817496.1